May it please the court. My name is Timothy Walton. I represent the appellants in this action before the Ninth Circuit. The public policy issue before this court is this. Who is empowered to enforce the law? Federal law and Washington state law offer two different determinations of standing. The court below ignored the plain language of both statutes in order to find the answer it wanted, which was not these plaintiffs. These plaintiffs were denied standing on the basis that the court below wanted the plaintiffs to prove actual damages, notwithstanding the fact that both statutes provide for specified damage amounts based on the actions of the spammer. Is it truly a question of standing as defined by state and federal law or a combination of determining who may bring the claim federally and then whether or not federal law preempts state law, regardless of what a Washington court might find in terms of who may bring a Consumer Protection Act or a SEMA claim? Well, that is the way that the district court looked at it, but even I guess what's wrong with the analytical framework first? Even if there is no standing under federal law, there can still be standing under state law Assuming there's no preemption. Assuming there's no preemption. So don't we first have to decide the question of standing and preemption before we even get to the state law claims? Well, the issue of preemption is the issue of state law. We have to, yes, determine standing for purposes of the federal law and preemption for purposes of the state law. Okay. So, well, what are the specific harms that your client suffered as a result of the defendant's emails and what evidence of specific injuries was before the district court? And can you point to specific parts of the record that support your client's claim of injury? Yes, Your Honor. I'm going to refer to the supplemental excerpts of record that was filed by the appellees as ER and there are seven specific issues of damages that were made under oath in the deposition. One was a tripling of server costs at ER-472. There was time spent in making opt-out requests, reconfiguring servers and filters, and time spent communicating with customers and others. The purchase of additional software, ER-473. Extra capacity requirements, ER-476. Delay in Mr. Gordon achieving his doctorate, ER-478. The expenditure of personal resources, ER-480. And other interference with business, ER-482 to 483. These issues of damages were specifically ignored by the district court, who inserted a requirement that the harm to an IAS be significant. There is no requirement under federal law that the harm be significant, but more that it be typical of an IAS. And in this case, the harms that the district court acknowledged are typical of an IAS and not of a consumer recipient of spam, such as the receipt of 1,500 e-mails from a single source. Would you agree with me that when Congress enacted the canned spam statute, that it was not granting private attorney general status to everyone? Yes, that's right. It's limited to Internet access services. Okay, so not every single individual who owns a single computer and one e-mail account has standing to bring a canned spam act claim. That's right. So what the district court focused on then was, how do we decide who is an Internet access server or an Internet access provider? Well, the district court said that the plaintiffs are IAS. It acknowledged that they provide Internet access services. Is there a dispute among the parties as to whether or not that is correct? I don't believe so. Okay, all right. So then the question becomes, what harm must the Internet access provider show in order to have standing to bring it? That's right. And in, for example, the As-Is versus Opt-In case, Judge Henderson decided that what the act really requires is that an IAS act like an IAS and carry spam over its systems and investigate the source of that spam, and that is precisely what the plaintiffs below did. Their servers carried the spam. They investigated the senders of the spam. They communicated with the senders of the spam, asking them to stop sending 1,500 e-mail messages every day, and the defendants chose to ignore those opt-out requests. And I don't think that the typical consumer receives 1,500 e-mail messages a day, much less the 5,000 to 8,000 total. Does it make a difference that your client set himself up in the business of receiving and addressing spammers? In this case, I don't think it does, and here's why. The spammers take advantage of the nature of e-mail to shift the cost of advertising to the recipients of their advertising, and the attempt here by Mr. Gordon was to set up a means to provide e-mail to users for free where the cost of that e-mail is shifted back to the advertisers who are sending the spam. But the record is not very well developed on that point. It appears to me as though the people that he was his customers, the people that he was serving, relinquished their accounts, and that he, in essence, became their nominee account holder for whatever purposes he sought to use their e-mails. Well, ironically, that is another example of harm that he suffered, was that his customers left the business because it was getting too much spam. How do we know that? I mean, all we know from what I saw on the record was that they relinquished their accounts. Is there something that was not presented in the excerpts of record that tells us why they did that? Yes, Your Honor. There's a great deal of evidence that unfortunately is not in the record. Yeah, we're stuck with the record. We're stuck with the record, and so I'm not going to cite to a place in the record that says that. I think if there's something that's in the district court record, but we didn't get it in the excerpts of record, you can tell us about what's in the record, but I don't think that we can base our decision on something that's not at all in the record. That's fine. I was addressing the question of whether it's appropriate for this type of business to be an IAS withstanding under federal law. You mean this type of business being, I mean, essentially someone that's a professional sleuth of spammers? Yes, exactly. Somebody who says, I can provide e-mail services for free, and I'm not going to use it as a loss leader like Microsoft uses Hotmail or Yahoo uses its e-mail services. We're not providing the service free so that you'll come view ads on the website or sign up for some other service, but purely as a free service to be funded by the people who are causing damage to the use of e-mail as a business tool as a whole, and those are the spammers. But the problem is that that doesn't sound to me like the activities of a typical Internet access server. I agree that it's not typical. It doesn't sound to me like somebody who's setting up a special computer server or network of servers in order, as Judge Callahan characterized it, to further his work as a spam sleuth. And the question is, is that who Congress had in mind when they enacted the CAN-SPAM Act and defined who could bring these claims? I think it is precisely who Congress had in mind. Congress intended that enforcement of CAN-SPAM would be by the Internet service providers, Internet access services that have an understanding of the e-mail systems and not burden the FTC or the attorneys general with these sort of actions when the government attorneys have other things to keep them busy. And, in fact, the Washington attorney general has been one of the most active in the nation in going after spammers, and they've only gone after a handful. There's lots and lots of spammers. Microsoft has been very active in suing spammers. But they haven't sued them all. They can't sue them all. It is incumbent upon mom-and-pop ISPs to pick up some of this burden, and that is what Congress intended. And in this case, Mr. Gordon had an innovative business model that looked at... I don't know if that expertise could bring claims, but did Congress contemplate someone just going into the business of being an IAS in order to be in the claims business? I don't know whether Congress intended that or even considered it, because that's not in the congressional record. But it seems to me that it makes sense, that that would be exactly who Congress would want to appear as plaintiffs, is someone with the desire, the expertise, the will to actually go after people who are using deceptive means intentionally to avoid being caught. It's unfortunate that... ...to large commercial entities such as America Online, that probably gets hundreds of millions of... I disagree. ...and whose service would be interrupted to their account holders if the volume of these messages caused their systems to crash and also caused them to spend enormous sums of money to increase their broadband capacity and all that sort of thing, because of the increased volume of spam messages. Your client... AOL is not the one who's suffering the damages, because they're passing those costs on to their clients. And the most recent estimate I've heard from 2003 is that it's about $2 per month per customer to deal with all the spam. And since spam has exponentially... Is AOL taking no action against the spammers? AOL? Entities like AOL. AOL is taking some action against spammers under Virginia state law. How would you define adversely affected? I would define that as having some harm that affects the operation of the business. So if an IAS is adversely affected, it means that, for example, it's dealing with greater email loads than it would have to if everybody followed the law. Of course it's easy to see some content to adverse effect if we're dealing with someone who's sort of in the normal IAS business and spam causes some adverse effect. But it's a little harder to grapple with it as to whether someone can enter the business to generate an adverse effect and therefore claim statutory penalties. I think that... But your client wants an adverse effect. My client wants to have standing under the law. The thing that we are... Spam, that's the problem we're having. But he's not... It's almost like a consensual harm, like... I don't think so. Sparing me in spam so that it crashes my system and I have to get bigger computer servers. If it had crashed his systems, then we wouldn't be here today because that was what the court was looking for. But you're missing my point. I mean, he's asking for it. That's the problem I'm having. It's one thing... Well, I don't think he is. He seems to be kind of an innocent victim who's trying to operate, let's say, a normal business like a floral shop. And you get thousands of spam messages that interfere with legitimate customer inquiries. But Mr. Gordon wants to be inundated with spam. Mr. Gordon wants to get the email that is sent to his servers. He didn't ask them to violate the law and to use deceptive headers and deceptive language. He did not consent to the violation of law. And we're not... We haven't even gotten to the issue of exactly how these guys are bad actors. His business is tracking down spammers and suing them. To pay to provide free email. He needs spam. He needs lots of spam in order to show that he's harmed. But the fact is that spam exists and that spammers use deceptive methods. And he's merely taking advantage of the one weakness that the spammers have in their business model. Which is that while they're busy hiding, they can't control every address of the millions or tens of millions of addresses that they send to. And they're taking the risk when they send deceptive email to an IAS that that IAS will sue. Thank you, Your Honors. Okay, Mr. Newman. Good morning, Your Honors. May it please the Court. The appellant began argument by stating the issue as being who is empowered to enforce the laws at issue. And we respectfully disagree that that's an issue. The law is clear and the Court reviewed a factual record and found that the statutes, weren't violated by the email issue. Well, see, appellant in IAS, he said that basically that was, that's not disputed by you. We respectfully disagree, Your Honor. And we believe the Court should review that issue de novo because the lower court, in that rare instance, misapplied the law. An Internet access service is defined by statute. And there's legislative history to back up to whom this statute is entitled to benefit. Well, I guess it sort of seems that if we were to adopt your approach that he's not an IAS, then we're going to have to get into like it's almost scienter or specific intent. Why? Even though it looks like, it walks like, it talks like, you know, a duck, but it's not because he's a spammer sleuth. So that's, so everyone else, other people that would have a similar setup could be an IAS. But the fact that this, the appellant is doing it and inviting spam and therefore he can't, is that? Under the plaintiff's interpretation of the law, any person who provides any type of access service would be considered an Internet access service. Accordingly, if I were to offer service in my home to my kids and my family by providing a computer, I'm an Internet access service. Alternatively, if I were to go to Gmail.com or AOL.com and sign up for a free e-mail account and give that username or password to a friend, I'm therefore an Internet access service. The truth is, is that under those examples I just provided, I'm merely a consumer who signed up with an Internet access service and then allowed my friends to use my service. Mr. Gordon acted in the same manner. He engaged a third-party company named GoDaddy. GoDaddy is an Internet access service. He registered domains at GoDaddy. He had GoDaddy host those domains. He had GoDaddy provide e-mail services. And when asked at deposition who provides the e-mail services, you or GoDaddy, the plaintiff testified that he didn't know and later acknowledged that it was indeed GoDaddy. Under those circumstances, he cannot be found to be an Internet access service. He's just a consumer who provides usernames and passwords to his friends and family. It seems to me if, you know, I mean, as courts, we like bright lines that people can understand to some extent. It seems that it's easier to say that he's an IAS, but then you get to what is adversely affected. And that goes back to Judge Tallman's point that if he's inviting spam, how can he claim, you know, in a consensual relationship, as it were, how can he claim injury? Under the plaintiff's definition of Internet access service, any consumer could, by a form over substance manner, become an Internet access service. But then they have to be adversely affected. So we look to the statute and we look to the types of harm that's associated with an Internet access provider. For example, the ones that we know about, AOL, Microsoft, ErcLink, carry large amounts of spam over their systems and they have bandwidth issues and server issues and hard drive issues and have crashes. They employ staff to maintain these systems and ensure that the problems don't occur again. It's a substantial problem and it's not only described in the legislative history, but in 15 United States Code 7701 itself. And unless a plaintiff experiences the type of harm that an Internet access service would typically experience, such as the ones I just described, then it is not adversely affected. Well, okay, so if you define it as significant, people like AOL and all of those, they're going to be able to show significant. But maybe isn't that too high a bar? I mean, there are people that are IASs, but they aren't rich, like AOL and all of that. I mean, shouldn't they be able to? I mean, that still could have adverse impact on them. They still could suffer injury, but maybe it, you know, then what do we say is significant? Does it have to be a million dollars? Does it have to be, you know, all of that? Your Honor, it's not an amount of money. Literally significant just means meaningful. Well, significant means meaningful. And in this circumstance, the plaintiff didn't show any meaningful harm. The plaintiff's testimony with respect to servers indicates that it wasn't in response to spam, but simply that the plaintiff bought a bigger server, and he testified that he didn't come close to using the resources of the server. Additionally, the party that really bore the burden of the spam that the plaintiff solicited was GoDaddy, which had the systems. It's the type of party that Congress intended to enforce the statute. And what's interesting is when reading the statute, there is a limited private cause of action for an Internet access service. How much money are people making doing this? Sending e-mail marketing? Well, no, obviously if you want to be an e-mail spam sleuth, what kind of money are people making doing this? Well, Your Honor, the. . . Or are they just trying to at this point? Is this a cottage industry? It certainly is. It's a formative stage. It is. It's unfortunate that we've had lots of clients who have been sued by Mr. Gordon, not just the defendant in this case, but other clients, and many of them have paid settlements, large settlements, to Mr. Gordon and to others, because the cost of litigation far outweighs the amount that the plaintiffs are seeking. Mr. Gordon in this case, because he had been successful in the past, raises settlement demands, and accordingly the case proceeded to summary judgment, and the defendants prevailed based upon the opinion that the district court wrote. But, excuse me, yes, the plaintiffs are earning a substantial sum in this cottage industry, and these are not the parties to which Congress intended the act to protect. Let's take this out of the high-tech context for a minute just to consider precedent. Now, is there general precedent about whether someone who, like, puts themselves in danger, creates a claim to make a claim? You know, let's say someone started a personal accident factory. They hired people to walk in dark clothes on roads at night with their backs to traffic and took assignments of their PI claims. Now, that would sort of clearly be contrary to public policy, but I don't know if there's any general precedent that says that if Mr. Gordon wants to generate a litigation factory, he's not allowed to. So is there any precedent outside of canned spam? Your Honor, just identified two affirmative defenses that arise under tort, namely mitigation of damages and assuming the risk. And when we defend these lawsuits and we have clients who are legitimate e-mail marketers that have complied with the law, but the plaintiffs have solicited e-mails, we plead the affirmative defenses of mitigation of damages and assumption of risk. Do they apply? Well, perhaps we'll be back before this Court in another matter because those haven't reached a decision by a lower court. But we believe that, no, Mr. Gordon is not allowed to solicit e-mails to make servers that are a form of a substance for the purpose of being in an access service simply to bring a cause of action. So that would be a way to assess the issue on the merits. But what the district court's doing here by saying there's no adverse effect is to say no standing. So on that theory, if that's correct, if there's no standing, we never get to the affirmative defense issues. That is correct, Your Honor. And that's why the district court in looking at whether the plaintiff was adversely affected looked at a very important issue. The district court dismissed whether he was in an access service and apparently reluctantly said he is and then looked and determined that this plaintiff was not adversely affected under any stretch of the facts. There was two days' worth of deposition testimony where this plaintiff was asked time and again, did you suffer any damages at all? The questions were asked in lots of different manners, and the plaintiff answered consistently, no damages. I'm only seeking statutory damages. Is there any precedent under any other area of law in the standing area, not the kind of affirmative defenses that, you know, you indicate you might plead, but statutes that require some kind of impact or adverse effect where a court has said somebody can't generate that and then sue? Well, again, Your Honor, you asked for precedent. And as I stand here, I can't cite the cases, but I think that the court is looking to the principles of equity and to defense and to mitigation of damages and assumption of risk. It's against public policy for plaintiffs to create a factory for litigation, which is why the district court described it as such. And in particular, this statute is designed to protect consumers but doesn't allow consumers a private right of action. Rather, the statute must be enforced by government agencies, the Federal Trade Commission, the Securities and Exchange Commission, the FCC, state attorney generals. But it does seem that there is some sort of private cause of action here. There's a private cause of action that's limited only to an Internet access service. Because, I mean, government doesn't, you know, it's not that government is this finely tuned, efficient machine in all instances. And so if, say, for example, AOL had to wait for the government to do something, they could go out of business in the meantime. Your Honor makes my point very well, namely that this statute provides a private right of action only for an Internet access service that's adversely affected. And even IAS can't sue under every section of the statute. There's only certain sections. And in Section 7706 of 15 United States Code, there is a list of violations, and several of them require a pattern or practice of an act by a defendant. One or two violations, or even 10 or 15 violations, wouldn't qualify as a violation that an IAS may sue for. A government may sue, but an IAS would not. So Congress crafted the statute specifically recognizing that AOL could go out of business if the government does not file a claim and providing a private right of action. But first, we have to have a bona fide Internet access service, and that comes straight out of the legislative history. And second, that Internet access service must be adversely affected. In this case, we do not have a bona fide Internet access service. We have a gentleman who signed up for accounts at GoDaddy and assigned six of them to family members. There were six people in particular, four of them shared the same last name as this plaintiff, none of them paid any money, and, in fact, most of them forfeited these accounts so that the plaintiff could collect spam over a period of years and then sue for them without complying with the statutory opt-out schemes that Congress provided. And, in fact, if this Court looks at the record and reviews the emails at issue, we'll see that there are not any deceptive headers. There are not any deceptive subject lines. So even if this case were to proceed to trial, if there were a triable issue, the jury would certainly find that there was no violation. Okay. So there was questions that were asked about preemption, and we don't believe that preemption is really an issue. We don't believe it is because the Attorney General's brief says, and we agree with them, that if you were to look at the Washington Commercial Email Marketing Act, that it is consistent with canned spam. It doesn't allow for an immaterial violation of statute. It requires deception under the law, and Washington has several years of jurisprudence that provides that a substantial portion of the public should reasonably be deceived before there would be a violation. So then it's not your position that the Washington Commercial Electronic Mail Act is preempted, but only that Gordon's alleged claims under SEMA are preempted? Or are you saying it is preempted? What is your claim there? In the supplemental memoranda that Juan Dominguez and the appellant filed, there was a lot of talk of stating a claim and pleading, and we do not believe that the Washington Commercial Electronic Marketing Act is preempted, and it exists in law and should not be stricken. But the plaintiff's theories under that act, namely that an immaterial violation that wouldn't really deceive someone should constitute a cause of action, does not. So his alleged theories are preempted? That is correct, Your Honor. Is your position? Yes. Preempted? I don't know why you wouldn't just say they don't state a claim. It doesn't seem to me it's not a classical use of the term preemption. Your Honor, I would concede that point. Under the statute, as the Attorney General reads it and submits it in an amicus brief that we agree with, under the Washington State statute, there's consistency with canned spam, and an immaterial violation would not violate the statute, and accordingly there is no preemption. But if a court were to find that Mr. Gordon were correct, that the law isn't as the Attorney General says that it is in its amicus brief, in that circumstance the statute would be preempted. And for those reasons, we respectfully request that this Court affirm the district court. Thank you. Okay. Mr. Walton, you may have used all your time, but I still have a question for you, so we'll give you a little time. Yes, Your Honor. Do you have any answer to the questions I posed to Mr. Newman? That is, whether there's any general precedent outside of the Canned Spam Act as to whether, like, a person sort of inserts themselves in a harm and has standing to sue for that harm, or whether that's a merits assumption of risk or some other kind of doctrine? I don't believe that there is any specific authority on the question that you've asked, although there is a district court case that discussed the issue of whether a professional plaintiff should be a pejorative term or not. But I would argue that if assumption of risk is going to be a legitimate defense, that means that every time you register a domain name, even if you do nothing with it but just hook it up to the Internet to receive email, you're assuming the risk that you're going to get email, because spammers look at registrations of domain names and start pumping out spam to email addresses even before anybody starts to use those email addresses for any purpose. Anyway, if it were an assumption of risk doctrine, we'd have to probably be reversing. It wouldn't be a dismissal under lack of standing, and there'd be some evidence. But what I wanted to know is, is there any precedent under statutes that address harm as an element of standing where this issue has been reviewed? I'm not aware of any other statutory scheme like this one, that premises standing upon an adverse effect, as opposed to damages as an element of a cause of action. Okay, thank you. Thank you. Okay, very interesting case, and we appreciate the fine arguments of Mr. Walton and Mr. Newman. Now, that case, Gordon v. Demando, shall be submitted. So we have one more case for argument today, but I think we should take a 10-minute break or 15-minute break. So then we'll resume.
judges: Gould, Tallman, Callahan